## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL RHODES               :

                           :

           **Plaintiff**      :

   **v.**                    :        **3:10-CV-290**

                           :        **(JUDGE MARIANI)**

PRINCIPAL FINANCIAL GROUP, INC.,  :

et al.,                 :

                           :

                           :

          **Defendants**   :

## MEMORANDUM OPINION

Presently before the Court are the parties' Cross-Motions for Summary Judgment (Docs. 40, 42). FED. R. CIV. P. 54(b) says, "When an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Because Plaintiff's short-term disability (STD) claims are ripe for determination, the Court will issue a final order granting Defendant's Motion for Summary Judgment on the STD counts only. However, because Plaintiff has not exhausted his administrative remedies for his long-term disability (LTD) benefits claim, the Court will not issue a final order on Plaintiff's claim for LTD benefits at this time.

## Factual Background

1

Because the Court grants Defendant's Motion for Summary Judgment on Plaintiff's STD

claims, it adopts Plaintiff's Statement of Material Facts and supporting exhibits (Doc. 41),

though there are essentially no disputes between the parties as to the material facts.

Between June 2007 and September 2008, Plaintiff worked as a regional sales manager.

(Doc. 41, ¶ 10).  His employer, Worthington Stairs, LLC (Worthington), estimated that

approximately 65% of the time, these trips would require overnight stays.  (Doc. 41, Ex. 4, p. 3).

According to Plaintiff, during his employment with Worthington, he was away from home for 93

days; he took 39 trips with 27 of those trips requiring overnight stays (69%) (Doc. 41, Exs. 4,

5).[1]  On September 11, 2008, he was diagnosed with Type I Insulin-Dependent Diabetes

Mellitus (Type I diabetes).  (Doc. 41, ¶ 22).

Worthington carried disability insurance with Defendant, Principal Life.[2]  (Doc. 41, ¶¶ 1-

2).  The policy gave Principal Life, the plan administrator and claims payer, "complete discretion

to construe or interpret the provisions of this group insurance policy, to determine eligibility for

benefits, and to determine the type and extent of benefits, if any, to be provided."  (Doc. 41, Ex.

1, p. 21).  To qualify for benefits under Defendant's STD Policy, a Member must be unable to

"perform the majority of the substantial and material duties of his . . . own occupation."  (Doc.

41, ¶ 4).

---

[1] Plaintiff's Reply Brief (Doc. 62), covers four particularly intense days in which Plaintiff drove 700 miles, spending sixteen hours in a car over two days.  He took six flights and spent an estimated fifteen hours in an airport or plane, and his days started as early as five am.  As a result, he either skipped meals or ate fast-food.  Defendant, however, points out that of all of these trips, Plaintiff switched time zones only nine times, and when he did, it was a difference of only one hour.

[2] The parties stipulated that Principal Life Insurance Company was the proper defendant in this suit.  Therefore, the other named defendant in the complaint, Principal Financial Group, Inc. was dismissed as a defendant (Doc. 16) upon joint motion of the parties (Doc. 15).

On November 13, 2008, Worthington faxed a Disability Claim Form to Defendant,

stating Plaintiff's last day worked was September 10, 2008. (Doc. 41, Ex. 3). The Claim Form

also included an Attending Physician Statement by Dr. Shoemaker, who noted that Plaintiff's

restrictions and limitations were to avoid travel, changing time zones, and irregular meal times.

(Doc. 41 ¶ 28). She also stated that Plaintiff could begin full-time trial employment in any other

job immediately. (Doc. 41, Ex. 3, p. 4). On November 17, 2008, Plaintiff informed Defendant by

phone that when he saw his primary care doctor on September 11, 2008, his sugar was

approaching "coma levels." (Doc. 41, Ex. 8, p. 3). After being referred to Dr. Shoemaker,

though, Plaintiff's sugar levels stabilized and were within a normal range. (*Id.*). Defendant

received Dr. Shoemaker's answers to its medical questions on December 8, 2008 and noted

that Plaintiff's A1C level was 13.1 % in September 2008 and 8.6%[3] on November 3, 2008.

(Doc. 41, ¶ 29). When asked about Plaintiff's daily functioning, she indicated that symptoms of

dehydration were resolved and there were no long-term complications. (Doc. 41, Ex. 3, p. 2).

Defendant was also informed that Plaintiff logged his sugars and was compliant with his

doctor's recommendations of diet, medications, and exercise. (*Id.*). Additionally, Dr.

Shoemaker's office note of November 13, 2008 stated that Plaintiff was "Feeling well –

Normal". (*Id.* at 4). Based on this evidence, Defendant approved STD benefits from

---

[3] According to the American Diabetes Association (ADA), normal levels for people without diabetes are 5%. For people whose diabetes is badly out of control, it can rise as high as 25%. *A1C*, AM. DIABETES ASS'N, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/a1c/ (last visited Dec. 30, 2011). The ADA recommends target ranges for diabetics should be below 7%. *Checking Your Blood Glucose*, AM. DIABETES ASS'N, http://ww.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html (last visited Dec. 30, 2011).

September 11, 2008 through November 13, 2008, but also determined Plaintiff was not eligible for STD benefits beyond November 13th. (*Id.* at 1).

Plaintiff requested reconsideration and submitted additional evidence in support of the appeal. (Doc. 41, ¶ 32). Dr. Shoemaker's letter dated February 18, 2009 said Plaintiff required a "reasonable" lifestyle. "I do not believe *any patient* would be able to maintain this level of control in the lifestyle that Mr. Rhodes [sic] job required." (emphasis added). (Doc. 41, Ex. 6, p. 2). She also noted, however, that Plaintiff had not been hospitalized for his diabetes and his A1C level was then down to 6.2%. (*Id.* at 1-2). Dr. Shoemaker sent a follow-up letter on May 19, 2009, in which she stated, a "return to the work and travel schedule of his former responsibilities would with a reasonable degree of medical certainty impact in a substantial and negative way on his health, future productivity and longevity." (Doc. 41, ¶ 39). Defendant sent Plaintiff's claim file for review by endocrinologist, Dr. Mitzner, who consulted with Dr. Shoemaker directly (Doc. 41, Ex. 11). They agreed that Plaintiff's diabetes would be under better control "in the long run if he did not work at this job with its hectic and long hours." (*Id.* at 2). Dr. Mitzner said, the "chances of this job impacting on his diabetes control and health would be greater as he gets further out from his diagnosis." (Doc. 41, ¶ 43). Yet they also "agreed that he is currently physically able to work at this job and that his medical needs and insulin regimen do not make it impossible for him to work at this job." (Doc. 41, Ex. 11, p. 2). Dr. Mitzner noted that "[t]here were no restrictions/limitations from 11/14/2008 to now that would have prevented him from working at his job. He needs to take insulin at meals and bedtime and needs to check his blood sugar at meals, and at times, between meals as well." (*Id.*). After

4

considering all the foregoing information, Defendant affirmed its prior denial of further STD

benefits. (Doc. 41, ¶ 45). Plaintiff then initiated suit claiming relief under the Employment

Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et. seq.* (Doc. 1),

meaning this Court has jurisdiction of the case under 28 U.S.C. § 1331.

The Maximum Benefit Payment Period is 13 weeks with a Maximum Weekly Benefit of

$750. (Doc. 41, Ex. 1, p. 9). Defendant paid Plaintiff 9 weeks of STD benefits. As such, on

Plaintiff's STD counts, the maximum remaining benefit to Plaintiff is 4 weeks' worth of STD

benefits, or $3,000. Plaintiff has not returned to work for Worthington, but it is unclear whether

he is otherwise currently employed.

## Standard of Review

*A. Standard of Review for Cross–Motions for Summary Judgment*

Through summary adjudication the court may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*,

901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party

moving for summary judgment bears the burden of showing the absence of a genuine issue as

to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing

has been made, the non-moving party must offer specific facts contradicting those averred by

the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

871, 888 (1990).  "Inferences should be drawn in the light most favorable to the non-moving

party, and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,

1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).  In this case, the parties have filed

cross-motions for summary judgment. (Docs. 32, 40, 45).  According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to
> summary judgment, and the making of such inherently contradictory claims does
> not constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and determination
> whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir.2008) (quoting *Rains v. Cascade*

*Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968)). Each movant must show that no genuine issue

of material fact exists; if both parties fail to carry their respective burdens, the court must deny

the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir.2008). When

reviewing each motion, the court is bound to view the evidence in the light most favorable to the

nonmovant. FED. R. CIV. P. 56; *United States v. Hall*, 730 F.Supp. 646, 648 (M.D. Pa.1980).

### B. Standard of Review for of Plan Administrator's Denial of ERISA Benefits

If a disability policy gives plan administrators discretionary authority to interpret the

policy, then a court reviews plan administrators' decisions under an arbitrary and capricious

standard. *Doroshow v. Hartford Life and Accident Ins. Co.*, 574 F.3d 230 (3d Cir. 2009).

Formerly, Third Circuit law held that if there were a structural conflict of interest (i.e., the plan

administrator was also the claims payer), then a court applied a heightened arbitrary and

capricious standard, thus giving less deference to plan administrators. *Pinto v. Reliance Std.

Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000). However, in *Metro. Life Ins. Co. v. Glenn*, 554 U.S.

105 (2008) the Supreme Court held that a conflict of interest was just one factor to consider

under the arbitrary and capricious standard, and the factors considered were case-specific.[4]

The Third Circuit has since abandoned the "sliding scale" approach from *Pinto. Doroshow*, 574

F.3d at 233-34. Defendant's decisions, then, will be upheld unless they are "clearly not

supported by the evidence in the record." *Michaels v. Equitable Life Assur. Soc'y*, No. 07-4256,

2009 WL 19344 at *4 (3d Cir. Jan. 5, 2009) (citing *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191,

199-200 (3d Cir. 2002)). That is, so long as there were reasonable bases for Defendant's

decisions, a reviewing court will not disturb those decisions. *Id.*

## Discussion

### A.  STD Benefits

The Third Circuit has interpreted ERISA to allow the grant of disability benefits based

upon the risk of future harm that will ensue should the claimant return to work. *Lasser v.*

---

[4] Some of the factors the Supreme Court noted in *Glenn* in addition to the conflict of interest were:

> In particular, the [circuit] court found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous). And the court furthermore observed that MetLife had emphasized a certain medical report that favored a denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion, and had failed to provide its independent vocational and medical experts with all of the relevant evidence.

*Id.* at 106 (internal citations omitted).

*Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 n.12 (3d. Cir. 2003). Plaintiff, relying almost

exclusively on *Lasser*, states that because both doctors opine that his return to work will

significantly raise his risk of disability in the future, he is entitled to summary judgment. In turn,

Defendant claims that because both doctors believe Plaintiff is presently able to work, it is

entitled to summary judgment. The ability to work presently versus the risk of future disability is

the central issue in this case. An examination of *Lasser* is therefore necessary to determine

both its scope and applicability to this case.

In *Lasser*, the plaintiff was an orthopedic surgeon who suffered from coronary artery

disease, which was exacerbated by an incorrectly performed coronary bypass surgery. *Id.* at

381. As a result, Dr. Lasser decreased his patient load by half, was no longer on-call at night

or on weekends, and ceased performing emergency surgery. *Id.* The insurer (Reliance)

initially approved LTD benefits, but after a year, terminated them based on a recommendation

by a certain Dr. Burke, a physician it hired to review Dr. Lasser's claim file. *Id.* at 384. Dr.

Lasser appealed that decision, and Reliance solicited opinions from two other doctors and also

commissioned a labor market survey to determine whether being on-call and emergency

surgery were material duties of an orthopedic surgeon. *Id.* at 387, 389. Both doctors

concluded that Dr. Lasser was disabled. *Id.* at 389-90. One stated that Lasser "cannot safely

perform the material duties of an orthopedic surgeon," (*Id.* at 389), and called Dr. Burke's work,

"sloppy." *Id.* n.9. The other said Lasser could work a 40-hour week, but "is not capable of

resuming all of the customary duties and responsibilities of an orthopedic surgeon." *Id.* at 390.

He, too, criticized Dr. Burke's assessment. Three other doctors opined that Lasser was

disabled, including his treating physician.  *Id.* at 390.  Similarly, Lasser's treating physician felt

that though "by all objective criteria Dr. Lasser is doing very well at this point in time," he was

disabled and could not "resum[e] all of the customary duties and responsibilities of an

orthopedic surgeon on a full-time basis[,] or at least that he could not do so without exposing

himself to a high degree of risk."  *Id.* at 390.  In addition, the results of the survey favored

Lasser,[5] but Reliance affirmed its earlier decision.  As a result, the court found there was

substantial evidence that such a reduction in duties meant Dr. Lasser could not perform the

major duties of an orthopedic surgeon and was consequently entitled to LTD benefits.  *Id.* at

388.  After carefully considering *Lasser*, this Court concludes that while that case does stand

for the proposition that the high risk of future disability can entitle a plaintiff to present disability

benefits, the risk of future disability *alone* does not guarantee benefits.  Specifically, the Third

Circuit stated, "whether risk of future effects creates a present disability depends on the

probability of the future risk's occurrence.  While Lasser's doctors have not precisely quantified

the risk in his case, their reports suggest that the risk is high," and "that stress is

incapacitating."  *Id.* at 391, n.12.

Assuming that *Lasser* applies to this case,[6] the Court concludes that the facts favor

Defendant with respect to the STD counts.  In *Lasser*, the insurer cut off benefits based on its

---

[5] Eight out of fourteen responses to the survey suggested that practicing without on-call and emergency surgery duties would "result in an occupation fundamentally different from orthopedic surgery." *Id.* at 388.  Five respondents "flat-out said that what Reliance proposed was impossible." *Id.*

[6] Defendant argues that *Lasser* may not be applicable for two reasons: 1) it was decided under the heightened arbitrary and capricious standard espoused by *Pinto*, so the district court did not give as much deference to the administrator that it would give today, and 2) it was a claim for LTD benefits. (Doc. 63).  The Court views *Lasser's* recognition of the risk of future disability being sufficiently high to constitute present disability as a statement unrelated to and not founded on the heightened arbitrary and capricious standard that was applied in *Lasser* and subsequently abandoned in *Doroshow*.

own doctor's highly-criticized assessment that the plaintiff was no longer disabled. Here, at the

time Plaintiff applied for disability benefits, his own treating physician said that his blood sugar

levels were stabilizing and approaching normal levels, after having been at "coma levels."

(Doc. 41, Ex. 8, p. 3). Dr. Shoemaker noted Plaintiff logged his sugars and was compliant with

her recommendations of diet, medications, and exercise. (*Id.*). Her notes indicate that at the

time he applied for STD benefits, he was "Feeling well – Normal." (*Id.* at 4). Thus, there was a

reasonable basis for Defendant to conclude Plaintiff's diabetes was under control, and he could

return to work. As a result, it paid STD benefits from the date of diagnosis to the date of

application for benefits. Despite Dr. Shoemaker's warnings about Plaintiff's long-term health

should he return to his job as a regional sales manager, Dr. Mitzner stated they agreed "that

[Plaintiff] is currently physically able to work at this job and that his medical needs and insulin

regimen do not make it impossible for him to work at this job." (Doc. 41, Ex. 11, p. 2). Dr.

Mitzner noted that "[t]here were no restrictions/limitations from 11/14/2008 to now that would

have prevented him from working at his job. He needs to take insulin at meals and bedtime and

needs to check his blood sugar at meals, and at times, between meals as well." (*Id.*). In

Plaintiff's request for reconsideration, he submitted a letter from Dr. Shoemaker stating, "I do

not believe *any patient* would be able to maintain this level of control in the lifestyle that Mr.

Rhodes [sic] job required,'" (emphasis added). (Doc. 41, Ex. 6, p. 2). Plan administrators "may

not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of the

treating physician," but under ERISA cases, they are not required to give special deference to

treating physician opinions as judges would under Social Security disability claims. *Black &*

*Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003).  The record shows that Dr.

Shoemaker and Dr. Mitzner discussed Plaintiff's condition on the phone.  (Doc. 41, Ex. 11).

Each doctor's prognosis was in substantial agreement with the other regarding the impact of

Plaintiff's return to work on his long-term health, and both agreed that he was presently able to

work.  (*Id.* at 2).  Thus, despite Dr. Shoemaker's assertion that no patient could maintain Type I

diabetes treatments with Plaintiff's job requirements, there was a reasonable basis for

Defendant to affirm its previous denial of further STD benefits.

Also, the defendant in *Lasser* ignored a plethora of evidence from multiple physicians

(including those it hired) and a labor market survey indicating the plaintiff was still disabled.

There is no such available third-party evidence here.  Furthermore, Dr. Lasser had proven that

under the terms of his disability insurance policy, he could not perform the substantial and

material duties of his profession[7] because he reduced his workload to such a degree that he

was not performing some of the material duties of his regular occupation on a full-time basis

(cutting out on-call duties on nights and weekends and all emergency surgeries, as well as

reducing his patient load by one-half).  Because Plaintiff did not return to his job after he was

diagnosed with Type I diabetes, there is simply no way for this Court to know whether and how

Plaintiff would be able to work while accommodating his illness.[8]

Plaintiff's strongest connection to *Lasser* is the concurring opinion of both doctors that

though he is presently capable of returning to work, resumption of full-time duties ultimately will

---

[7] The terms of his policy stated, he was disabled if as a result of disease or injury, he was capable only "of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis."  344 F.3d at 386.

[8] This statement is not intended to condemn Plaintiff for "failing" to return to work.  It is simply noted to indicate a lack of evidence in the record on this point.

put him at substantial risk of future disability. They agreed that Plaintiff's diabetes would be under better control "in the long run if he did not work at this job with its hectic and long hours." (*Id.* at 2). Dr. Mitzner said, the "chances of this job impacting on his diabetes control and health would be greater as he gets further out from his diagnosis." (Doc. 41, ¶ 43). As stated before, the existence of the risk alone of a present condition giving rise to future disability does not guarantee STD benefits for Plaintiff. Instead, *Lasser* focuses on the "probability of the future risk's occurrence." 344 F.3d at 391, n.12. In *Lasser*, the risk of future disability based on the stress inherent in Dr. Lasser's duties as an orthopedic surgeon was found to be "high" and his doctors opined that such stress was "incapacitating." *Id.* The facts of that case included not only the risk of future disability, but also several opinions and other objective evidence that Dr. Lasser was already presently disabled. No such facts exist here.

Finally, it is true that Defendant had a structural conflict of interest in this case, but under *Glenn*, *supra*, it is one of several factors to consider. Unfortunately for Plaintiff, the other factors present in *Glenn* and *Lasser* that the reviewing courts cited as evidence of an abuse of discretion are not present here. There were reasonable bases for Defendant's decision to discontinue STD benefits and affirm that denial of benefits. Because of the deferential standard of review afforded to plan administrators and the substantial evidence in the record supporting Defendant's decision to deny further STD benefits, the Court cannot find that Defendant

abused its discretion, and the Court grants Defendant's Motion for Summary Judgment on the STD claims.[9]

## B. LTD Benefits

Plaintiff admits he has never filed any claims for LTD benefits with Defendant, claiming it would be futile to do so. A federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan. *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002)). Plaintiff is excused if he can show it would be futile to exhaust his remedies. In *Harrow*, the Third Circuit said, a "plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* at 249. Yet, Plaintiff has not shown with certainty that Defendant would deny its LTD claim, even under the "own occupation" standard in the governing policy.[10]

---

[9] While the Court is granting Defendant's motion for summary judgment on Plaintiff's STD claims, it is doing so because it is bound by the "arbitrary and capricious" standard. The Court also notes that but for the timing of Plaintiff's claim, he may have been considered disabled under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), which became effective on January 1, 2009. 42 U.S.C. § 12102(4)(D). To obtain relief under the ADAAA, a plaintiff must prove he is disabled; that is, he has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." Before the amendments, the Supreme Court held that "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). However, through the ADAAA, Congress partially overturned *Sutton* which "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities." Pub. L. No. 110-325, § 2(a)(4), (5), & (6). To make itself clear, Congress wrote into the amendments, "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without regard* to the ameliorative effects of mitigating measures such as . . . medication." 42 U.S.C. § 12102(4)(E)(i) (emphasis added). This amendment clearly impacts plaintiffs suffering from diabetes. Yet, the Third Circuit has said the ADAAA is not retroactively applicable. *Britting v. Sec'y, Dep't of Veterans Affairs*, No. 10-2554, 2011 WL 300240, at *2, n.3 (3d Cir. Feb. 1, 2011) (citing eight other circuits uniformly holding that the ADAAA was not retroactive). Plaintiff could have raised a strong case for disability on his ERISA claims by analogy, had the ADAAA become effective earlier.

[10] In the Court's view, the absence of any disputes between Dr. Shoemaker and Dr. Mitzner that Plaintiff's health is distinctly likely to deteriorate if he returns to work may entitle him to LTD benefits. However, that determination, in the first instance, must be made by Defendant after Plaintiff makes proper application.

There is also no evidence that there is any LTD claim pending evaluation with

Defendant, so the Court cannot issue a stay on the declaratory judgment proceeding.  The

Court, however, in view of the well-established preference for adjudication on the merits of a

matter rather than upon technical or procedural issues, *see, e.g., Foman v. Davis*, 371 U.S. 178

(1962); *Victory v. Manning*, 128 F.2d 415 (3d Cir. 1942), will not deny this claim for Plaintiff's

failure to exhaust his remedies under the plan and thereby potentially force Plaintiff to start

afresh with a new federal suit should Defendant deny Plaintiff's LTD claim.  Therefore, the

Court will deny both motions for summary judgment on the LTD count without prejudice and

administratively close the case.  The case may be re-opened upon motion by either party at

any time upon exhaustion of Plaintiff's remedies under the plan.[11]  This is *not* a final and

appealable order as Plaintiff's declaratory judgment action remains pending (*WRS, Inc. v.

Plaza Entm't, Inc.*, 402 F.3d 424 (3d Cir. 2005)),[12] and the issue of Plaintiff's eligibility of LTD

benefits, if unresolved through the application process, may require determination by the Court.

In the event the parties resolve Plaintiff's LTD count between themselves or Plaintiff elects not

to pursue his LTD claim, the Court directs them to give notice to the Court.

## C.  Attorney's Fees and Costs

This Court's Memorandum Opinion does not address Plaintiff's claim for attorney's fees

and costs (Doc. I, Compl. Count X) under 29 U.S.C. § 1132(g).  Count X survived the Order

---

[11] Under the terms of the LTD policy, the maximum monthly benefit is $4,000 and the "own occupation" period is two years, totaling a potential $96,000 in LTD benefits for Plaintiff. (Doc. 41, Ex. 2, p. 9).  After two years, the standard switches to "any occupation." (*Id.* at 39).

[12] The district court's order had said, "The Clerk shall accordingly mark the above-captioned case as closed. Nothing contained in this order shall be considered a . . . disposition of this action, and should further proceedings therein become necessary or desirable, any party may initiate the same in the same manner as if this order had not been entered." 402 F.3d at 426.

dismissing Counts I-V when Judge Munley dismissed Defendant Principal Financial Group, Inc. from the case (Doc. 16). Yet, neither party's motions included a request for attorney's fees, and the matter was not briefed or otherwise submitted to the Court.

## Conclusion

Pursuant to FED. R. CIV. P. 54(b), the Court will issue a final order on Plaintiff's STD benefits claims granting Defendant's Motion for Summary Judgment. As to Plaintiff's LTD claim and prayer for declaratory judgment, the Court will deny both Motions for Summary Judgment without prejudice on the basis stated herein and direct the Clerk of the Court to administratively close the case. An appropriate order follows.

Robert D. Mariani
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL RHODES                              :
                                            :
                    Plaintiff               :
                                            :
        v.                                  :       3:10-CV-290
                                            :       (JUDGE MARIANI)
PRINCIPAL FINANCIAL GROUP, INC.,            :
et al.,                                     :
                                            :
                    Defendants              :

## ORDER

AND NOW, to wit, **THIS 30th DAY OF DECEMBER, 2011, IT IS HEREBY ORDERED**

**THAT:**

1. Defendant's Motion for Summary Judgment on Plaintiff's Short-Term Disability counts
   (Doc. 42) is **GRANTED** and Plaintiff's Motion for Summary Judgment on the Short-Term
   Disability counts (Doc. 40) is **DENIED.**

2. **JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF**
   on the Short-Term Disability counts only.

3. Both Motions for Summary Judgment (Doc. 40, 42) on Plaintiff's Long-Term Disability
   count are **DENIED WITHOUT PREJUDICE.**

4. The Clerk is hereby directed to **ADMINISTRATIVELY CLOSE** the case.

Robert D. Mariani
United States District Judge

16